## CHARLES G. ALLEN *vs.* THE BOARD OF CHOSEN FREE-
## HOLDERS OF THE COUNTY OF MONMOUTH.

In cases of public nuisance, a bill in equity asking relief by way of pre-
vention, can be maintained by a private person only on the ground of
apprehended special damage peculiar to himself, and distinct from that
done to the public at large.

A statute of this state authorized the freeholders of the county of Mon-
mouth to erect a bridge over the Navesink river, "beginning at or near
the house of Samuel Hubbard, esq., commonly called Smock's point, or
near the house of Joseph Van Schoick, or from Joseph Smith's point to
the opposite shore." On 3d January, 1826, the freeholders selected the
site for the bridge, and upon which it was accordingly erected. A rail-
road had been recently constructed intersecting the road near the bridge
at the south side of the river, rendering the use of the road at that ter-
minus dangerous. To avoid this inconvenience, it was now proposed, in
erecting a new bridge, to locate its southern terminus at a point about
one hundred yards west of its original site. The complainant was the
owner of about twenty-five acres of land, near the termination of the
existing bridge, bounding on the public road leading from the bridge, of
a valuable wharf upon the river, a boarding house, and other valuable
improvements, situate upon streets connected with the road leading to
the bridge, to all of which it afforded the most convenient access.

*Held*—1st. That the right to erect bridges over navigable rivers does not
reside in the chosen freeholders by virtue of their general powers, but
must be derived from special power conferred by the legislature.

2d. That by the above act, the power of locating the bridge within certain
limits was given to the discretion of the freeholders; but that having
exercised that discretion, and the selection having been made, their
power was exhausted.

3d. That in this case the freeholders had not the power materially to alter
either terminus of the bridge.

4th. That the injury sustained by the complainant was in no sense peculiar
to himself, and on this account his bill could not be sustained.

5th. That although the new bridge was technically a nuisance, yet as it
was being built in good faith and for the public benefit, a court of equity
would not restrain its erection, even on an information by the attorney
general in behalf of the public.

----

An injunction had been allowed on filing the bill, and
a motion was now made to dissolve it.

*J. Parker* and *Vroom,* for motion.

*Allen* and *Dayton,* for defendants.

THE CHANCELLOR. The complainant, by his bill, asks an injunction to restrain the defendants from changing the location of a bridge across the north branch of Navesink river, in the county of Monmouth. The intervention of this court is asked upon the ground that the defendants have no power or authority to change the location of the existing bridge, and that the change of location will be a peculiar and irreparable injury to the property of the complainant.

The bridge was originally located and constructed by the board of chosen freeholders of the county of Monmouth, under the authority of an act passed on the third of December, 1825. The act authorizes the bridge to be erected, " beginning at or near the house of Samuel Hubbard, esq., commonly called Smock's point, or near the house of Joseph Van Schoick, or from Joseph Smith's point to the opposite shore." (*Pamph.* 54.) On the 3d of January, 1826, the freeholders, under authority of the act, selected the site for the bridge, and ordered that it should be located " at Oyster-shell point, over said river, to the opposite shore, near Josiah Van Schoick's." The bridge was erected upon the site thus determined upon, and having become dilapidated, in the year 1839, a new bridge was erected about six feet east of the old bridge, but substantially upon the same site and within the limits of the public highways upon both sides of the river. It ·is now proposed to erect a new bridge, commencing at the same point, near Van Schoick's house on the north, or Middletown shore of the river, but extending to the opposite, or Shrewsbury shore, about one hundred yards west of the site as originally located. On the Shrewsbury shore the bridge, as proposed to be located, does not connect with the ancient and existing highway, but with a new road laid out, or proposed to be laid out, though not yet lawfully authorized, to connect with the ancient highway some distance from the termination of the bridge.

Have the freeholders power to make the proposed

change in the location of the bridge? By the general
laws of the state, the erection and maintenance of county
bridges is committed to the discretion of the chosen free-
holders of the respective counties. It is their province
to decide upon the necessity or expediency of erecting a
bridge, to fix the location, and determine the mode of
construction. With this discretion the courts have no
power to interfere. But this authority does not extend
to the erection of bridges across navigable rivers. The
channels of public rivers cannot be obstructed, nor their
free navigation impeded, except by authority of the legis-
lature. Hence the existing bridge across the Navesink
was erected, as all bridges over navigable rivers in this
state must be, by express legislative sanction. The right
to erect the bridge or to determine the site does not reside
in the board by virtue of their general powers, but is de-
rived from the power conferred by the legislature.

The legislature, by the act in question, gave authority
to the board to erect the bridge at one of three designated
points, and thence across the river to the opposite shore.
Within those limits the power of location was given to
the freeholders. But that discretion having been exer-
cised, and the selection having been made, the power was
exhausted. It is not a continuing power, which enables
the freeholders in all future time to change the location
at pleasure. The general principle of the law is, that
when the power of election has been once exercised,
when the election is made the power is determined.

A railroad or company, having once located their route
under the authority of their charter, cannot alter the loca-
tion. *Morehead* v. *The Little Miami R. R. Co.*, 17 *Ohio R.*
340; *Little Miami R. R. Co.* v. *Naylor*, 2 *Ohio R.* 235;
*Pearce on Railroads, &c.*, 218.

Nor can a canal company change the dimensions of
their canal after it has been constructed, though the pro-
posed change is within the power originally conferred
upon the corporation by their charter. *Blakemore* v. *The
Glamorganshire Canal Navigation*, 1 *Mylne & K.* 154.

Nor can a turnpike company change the location of their gates which have once been located by the corporation under authority of law. *State* v. *Norwalk and Danbury Turn. Co.,* 10 *Conn. R.* 157; *Turnpike Co.* v. *Hosmer,* 12 *Com.* 364; 2 *Swan* 282; 18 *Johns. R.* 397.

So when an unlimited discretion as to the location of a bridge is vested in a bridge company, when that discretion is exercised and the bridge built the grant is located, and the power of location is executed and gone. *Cayuga Bridge Co.* v. *Magee,* 6 *Wend.* 85.

The principle, as applied to private corporations, is not denied or questioned. No reason is perceived why the same principle should not apply where a special power is conferred, and an election given to a board of chosen freeholders to erect a bridge over navigable waters. In such cases the discretionary powers of the board may be exercised in regard to all matters to which they appertain, as in the case of all other bridges they may decide whether the bridge shall or shall not be erected, what shall be the character and cost of the structure, and whether it shall be continued or abandoned. All these are matters of discretion, vested in the board by virtue of their office, and in no wise dependant upon the special grant of power to erect the bridge. Thus in *Tucker* v. *The Freeholders of Burlington (Saxton* 282), it was held that an act which authorized the freeholders, at their discretion, to build and maintain a bridge over Bass river, at a specified point, vested in the freeholders a right to build the bridge at the point specified, whenever, in their discretion, the right might be advantageously exercised.

The power of building the bridge was conferred, and the location designated by the act. The time of building was left to the discretion of the freeholders, and might be exercised by them at their pleasure. No election as to the exercise of the special powers conferred was given by the act. But when a special power is conferred upon the freeholders of building a bridge over navigable water,

and of locating it at one of two or more points, the election is not made by virtue of the general discretionary power of the board, but by virtue of the special power conferred by the act. It is not a continuing power, but when once exercised it is gone for ever. The freeholders having, in pursuance of the power conferred by the act, located and built "the bridge at Oyster-shell point, over said river, to the opposite shore, near Josiah Van Schoick's," have no power to change the location or materially to alter either terminus of the bridge. The case is not altered by the fact stated upon the argument, that Oyster-shell point includes a large extent of shore, including the point at which the new bridge is to have its termination, so that the location of the new bridge is not in conflict with the election originally made. What the board meant by their election is best ascertained by their action. The maps exhibited in the cause show that the bridge on the Shrewsbury side of the river terminates at a point of land in the bend of the river. The building of the bridge at that point shows that the freeholders, by the location at Oyster-shell point, intended the point at which the bridge is built, and not an indefinite extent of shore. This construction of the power conferred in the location of bridges is imperatively demanded on considerations of public policy. In authorizing the construction of a bridge over navigable waters, the legislature may wisely leave to the discretion of the freeholders the designation of the precise point at which the bridge shall be located. But when the election has been made, and the bridge erected, and when, in the progress of time, roads are opened, buildings erected, and valuable improvements made, adapted to and induced by such location, the consequences of a change of location may be such as the legislature never could have contemplated and never designed to authorize. A change of circumstances has rendered a change of location, which was a matter of indifference when the law was passed, highly prejudicial alike to private and to public interests.

A power of election, which in the one case the legislature might be willing to confer, in the other they would feel constrained to deny. The public grant of power in this case, as in all others, must be strictly construed. It conferred upon the freeholders the power of election, and the right having been exercised, the power is exhausted. I am of opinion that the freeholders have no rightful power, under the special authority conferred upon them by the legislature, to change the location of the bridge in question.

The defendants further claim that, if the special power conferred by the statute is exhausted, they may lawfully change the location of the bridge, by virtue of their general powers, on the ground that the river has ceased to be navigable. The river has always been regarded as navigable. Bridges at and above this point have always been erected by legislative authority. The facts alleged and proved by the defendants, though they seem to show that the navigation above Red bank is of little comparative value, do not prove that the stream is not navigable, and that it is consequently withdrawn from the guardian power of the legislature. The freeholders themselves have not so regarded it.

But this case must be decided upon other grounds. I have expressed an opinion upon this point because it was elaborately argued by counsel, and because it was intimated that it was desired for the satisfaction of the freeholders that the views of the court upon the question of power should be known.

The change of the location of the bridge is unlawful, as being an unauthorized obstruction in the channel of a navigable river. Obstructions to navigation are public nuisances. They are to be remedied at common law, by indictment, or in equity, by an information filed by the attorney general. *Angell on Tide waters* 115, 117; *The Attorney General* v. *Stevens, Saxton* 369; *The Attorney Gene-*

*ral* v. *The New Jersey R. R. and Trans. Co.*, 2 *Green's Ch. R.* 136; *Newark Plank Road Co.* v. *Elmer*, 1 *Stockt.* 754.

In cases of public nuisance a bill in equity, asking relief by way of prevention, can be maintained by a private person only upon the ground of apprehended special (and peculiar) injury to himself, distinct from that done to the public at large. *Angell on Tide waters* 121; *Crowder* v. *Trickler*, 19 *Vesey* 616; *Corning* v. *Lowerre*, 6 *Johns. Ch.* 439; *City of Georgetown* v. *Alexandria Canal Co.*, 12 *Peters* 91; *Bigelow* v. *The Hartford Bridge Co.*, 14 *Conn. R.* 565.

The complainant, by his bill, represents that he is the owner of twenty-five acres of land in the village of Red bank, near the termination of the existing bridge, bounded on one side by the river and partly by the public road leading from the bridge through the village. That he owns a valuable wharf upon the river, a large boarding house and other valuable buildings and improvements in the village, situate upon streets connected with the road leading to the bridge, to all of which it affords the most ready and convenient access. He claims relief on the ground of special injury to his rights as a citizen, in the navigation of the river, as the owner of the real estate, in the depreciation of its value, and as a taxpayer, by being compelled to pay an increased amount of tax for the cost of a work proposed to be erected without lawful authority.

As regards the rights of navigation, it is manifest that the complainant sustains no injury by the erection of the new bridge not common to every citizen.

The complainant owns no wharf or other property above the bridge. His wharf, his land, and all his improvements lie below the existing bridge. If it was proposed to erect the new bridge further down the river, so as to prevent all access to his wharf, there would be at least a semblance of reality in his claim of special injury. But the new bridge is proposed to be located further up the stream, leaving the present bridge between it and the defendant's property.

It is not perceived, therefore, how the complainant can sustain any special or peculiar injury from the obstruction of navigation.

The complainant's land does not lie adjacent to the present bridge, nor within 100 feet of its termination. He owns no land, as appears by the defendant's answer and the accompanying map, between the termination of the present bridge and the point where the new road to the proposed bridge will intersect the ancient highway. All the injury which can result to his property from the erection of the proposed bridge will be by rendering the approach to a part of his property somewhat less direct, and by diverting a portion of the travel from passing his land, thus rendering it less public. But these constitute no grounds of legal injury or equitable relief.

The injury which the complainant suffers as a taxpayer he sustains in common with every other taxpayer of the county, and in this respect the damage which he sustains is in no sense special or peculiar: and if it were, a court of equity would not exert its restraining power to arrest a great public improvement on the alleged ground that a dollar would thereby be added illegally to the amount of the complainant's tax.

The injunction must be dissolved, and the complainant's bill dismissed with costs.

To guard against misapprehension, it is proper to add that, aside from the form of proceeding, there is nothing in the case, as it appears upon the defendant's answer, to warrant the interference of this court, even upon an information. A court of equity exercises its restraining power in cases of public nuisance with great caution.

In the case of *The Attorney General* v. *The New Jersey Railroad and Transportation Co.*, Chancellor Vroom denied the relief in a case somewhat similar to, but much stronger than the present. The river above the bridge is comparatively little used for the purposes of navigation or float-

age. No masted vessels pass it. For several years the draw in the existing bridge has been removed or disused. The railroad bridge, recently erected further down the river, is without a draw. The erection of the new bridge will create no serious impediment to navigation.

A change of location of the bridge from the present site has become highly expedient, if not absolutely necessary. The Raritan and Delaware Bay Railroad intersects the highway near the termination of the old bridge at a very acute angle, and runs for some distance within the limits of the road, rendering the use of the highway inconvenient and dangerous. A due regard to the safety of the lives and property of the travelling public requires the removal of the bridge and highway to a position more remote from the railroad. The action of the board, in making the change, appears to have been adopted in good faith, upon due deliberation in accordance with public sentiment, and upon the petition of large numbers of the inhabitants of the county residing in the vicinity. Under such circumstances there is no reasonable pretext for interfering with the action of the freeholders, although the work that they propose to construct may technically constitute a public nuisance. Whether the public exigency is such as to require the immediate action of the board without securing the concurrence of the legislature, is a question solely for the consideration of the freeholders, the legally constituted guardians of the public interests of the county.