216 N.J. Super. 166 (1987)
523 A.2d 250
IRONBOUND HEALTH RIGHTS ADVISORY COMMISSION, ET AL., PLAINTIFFS-RESPONDENTS,
v.
DIAMOND SHAMROCK CHEMICAL COMPANY, ET AL., DEFENDANTS-RESPONDENTS, AND NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, NEW JERSEY DEPARTMENT OF HEALTH, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 5, 1986.
Decided March 23, 1987.
*167 Before Judges ANTELL, BRODY and LONG.
Richard Engel, Deputy Attorney General, argued the cause for appellants (W. Cary Edwards, Attorney General, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Richard Engel, on the brief).
Michael Gordon argued the cause for respondents (Gordon & Gordon, attorneys; Timothy S. Haley, on the brief).
*168 Susan Remis Silver, Assistant Deputy Public Advocate, argued the cause for the Public Advocate, amicus curiae (Alfred A. Slocum, Public Advocate, attorney).
The opinion of the court was delivered by LONG, J.A.D.
This appeal arises out of a suit filed by plaintiffs, Ironbound Health Rights Advisory Commission, et al. (IHRAC) against defendants, Diamond Shamrock Chemical Company (Diamond Shamrock), the New Jersey Department of Environmental Protection (DEP) and the New Jersey Department of Health (DOH)[1] (collectively, the State). The State here claims that the trial judge exceeded his authority when he ordered it to prepare and implement a plan of health testing and monitoring to address an environmental problem in the Ironbound section of Newark. We agree and reverse.
From 1957 through 1970, the Diamond Alkali Company of Cleveland, Ohio (later Diamond Shamrock) operated an agricultural chemicals manufacturing facility at 80 Lister Avenue, Newark, New Jersey. At this site Diamond Shamrock manufactured herbicides which produced 2,3,7,8 tetrachlodibenzo-p-dioxin (dioxin), a substance highly toxic to human beings, as an unwanted by-product. Reports indicate that in the late 1950's and again in the early 1960's explosions occurred at this location. From 1966 through 1968, the herbicide, Agent Orange (2,4-D and 2,4,5-T) was produced at this site under a federal government contract. In 1969, Diamond Alkali sold the site to Chemicaland Company which operated the plant until 1971. The site then remained idle until 1981, when Marisol, Inc. *169 purchased it. Marisol initiated clean-up activities, but never began production.
In the spring of 1983, the DEP and the United States Environmental Protection Agency (EPA) undertook a sampling and environmental monitoring program on the site. This testing showed that levels of dioxin there were as high as 51,000 parts per billion (ppb) and that the levels of dioxin were greater than 1,000 ppb throughout the adjoining residential and business area. According to the Federal Centers for Disease Control, dioxin concentrations in the soil of one ppb constitutes an "unacceptable risk to human health."
Based on the DEP's conclusion that an emergency existed, Governor Kean issued Executive Order No. 40 on June 2, 1983, declaring a state of emergency in the Ironbound section of Newark in the area of 80 Lister Avenue. The Governor directed the DEP to adopt emergency measures to check any threat of danger and authorized the Commissioner to take measures to abate the emergency.
On July 28, 1983, pursuant to the Governor's executive order, the Commissioner issued Administrative Order No. 40-9 which imposed restrictions on the outdoor display of consumer goods in the Newark farmers market food distribution area (Ironbound). Two days later the Commissioner issued Administrative Order No. 40-10, directing the immediate vacuuming and cleanup of the streets in the residential areas immediately adjacent to the Diamond Shamrock site. On August 3, 1983, the Commissioner issued Administrative Order, No. 40-11, prohibiting all train traffic in the area of the abandoned Diamond Shamrock site.
On August 1, 1983, IHRAC filed a complaint and Order to Show Cause against a number of defendants including Diamond Shamrock and the DEP. This complaint, which was brought pursuant to the Environmental Rights Act, N.J.S.A. 2A:35A-1 et seq. and the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq., sought preliminary and permanent relief *170 requiring defendants to clean up and remove all dioxin in the area surrounding 80 Lister Avenue in a manner approved by the court.
After a preliminary hearing the trial judge placed the matter on inactive status in order to give the State the opportunity to develop a plan to solve the health problem at the Shamrock site and to resolve any legal issues implicated in this action. An enormous amount of legal maneuvering, which need not be recounted in detail, followed. It is sufficient to say that IHRAC took the position that the State was failing in its "obligation to protect the public and environment by enforcing" the laws. More particularly, IHRAC claimed that the State needed to adopt a plan to deal with the dioxin problem. The State countered, claiming that it was not a proper party to the litigation. At the same time, the State outlined for the trial judge its strategy in addressing the dioxin issue.
After hearing testimony on these matters, the trial judge found
that the State is not properly organized in the way in which it's tackling this problem and it seems to me that one major difficulty with the State's response thus far is that there is no articulated, written strategy which is publicly available telling everybody what the State's approach is.
Based on this, the trial judge ordered the DEP to file a written plan for dealing with the Ironbound environmental problems no later than June 30, 1984.
The DEP filed the requested plan which the trial judge found "manifestly inadequate." He was critical of the way in which the plan addressed the public health concerns, in particular the lack of a screening and testing strategy with respect to workers and residents who may have been affected by the contamination. In an oral decision, the trial judge required the State (which by then included the DOH) to:
submit to the Court by the October date [October 31] a plan for identifying, testing, and tracking the people at special risk and that plan must certainly include very detailed testing programs for the workers at this site during the occupancy of the site by Diamond Shamrock and almost certainly should include similar programs for post-production employees who have been at the site.
*171 In response the State informed the judge that it did not have the necessary personnel or funding to implement such a testing and screening program. Although a request for funds had been made to the United States Department of the Treasury, the State asserted that without approval from the Treasury the State could not proceed. The State also pointed out that it had negotiated an administrative consent order with Diamond Shamrock in which Diamond Shamrock agreed to commit millions of dollars to fund the cleanup of the dioxin problem.
Pursuant to the trial judge's order the State submitted its "Workplan for Health Assessment Activities in the Vicinity of 80 Lister Avenue, Newark, New Jersey." This plan proposed a comprehensive medical examination of former Shamrock employees and progressively less comprehensive examinations of subsequent 80 Lister Avenue occupants, employees of neighboring industries and nearby residents of Lister Avenue, who would be screened through a questionnaire. This plan represented that the National Institute of Occupational Safety and Health (NIOSH) was going to perform a health study of all former Diamond Shamrock workers, and that the State wished to allow this study by NIOSH to proceed. The plan also reiterated that the State did not have the necessary resources to conduct this study on its own but that it would seek to have money appropriated for this purpose. (The cost of testing the former Diamond Shamrock workers alone was estimated to be $1.5 million dollars.) The State then moved to dismiss.
In response, IHRAC asserted that because the Governor had declared a public health emergency through his executive order, the court should not cede jurisdiction until a comprehensive medical testing and screening program was implemented. The trial judge denied the motion to dismiss the complaint against the State agencies for pragmatic reasons:
The reason why I have been focusing so much on State action is the purely pragmatic one, that although I theoretically could and if I had no other devices available to me would require Diamond Shamrock to undertake physical cleanup without any benefit of supervision from the State agency and then I would also *172 give serious thought to requiring Diamond Shamrock to set up a health monitoring system and fund it.... I have not actually gotten to that point because the reality is that we do have two State agencies with a considerable volume of accumulated knowledge and with a great amount of expertise and with a substantial amount of sophisticated personnel who can assist in making sure that Diamond Shamrock does what it should do.
He then heard testimony as to the the State's plan which he determined was inadequate.
Eventually the State notified the judge that the federal government had denied funding for the NIOSH study. IHRAC responded by asking that the trial judge order the State defendants to secure the necessary funding for these examinations. The State reiterated its position that federal funding had not been approved and that the State had neither the financial nor administrative resources to conduct the study.
The trial judge rendered an oral opinion on December 20, 1985:
I will enter a judgment declaring that it remains the duty of the Commissioner of the Department of Environmental Protection to continue his efforts to cleanup the site, to render it as safe as can feasibly be done ... He remains charged with the obligation to do that, with the responsibility to supply the, in one way or another, the financial and technological resources of personal resources to do that.
The Commissioner of the Department of Health remains responsible to implement the health plan which has previously been approved, or something substantially equivalent to that.
If federal funding can't be developed, it remains the responsibility of the Commissioner to develop some other kind of funding, whether it be State government funding or a combination of State government funding and contribution from other parties who may be responsible. It's the responsibility of the Commissioner to stay on top of that and to see that program through.
Now, involved in what I've decided now, of course, is a denial of the request for interim relief compelling Diamond Shamrock to fund the health plan. I'm leaving the funding of the health plan in the hands of the Commissioner of Health. He has a plan that he has put on the table. It's been approved by the Court and it is his responsibility, that is to say, the Commissioner's responsibility, to implement this plan. And how he goes about it is essentially something for him to determine. So we'll see what he does about that.
If he wants to pursue Diamond Shamrock, he can do that. I'm not going to become involved in that. It's the Commissioner's responsibility
This decision was embodied in an order dated January 8, 1986.
*173 The State filed a Notice of Appeal challenging the portion of the January 8, 1986 order which required it to "implement (with federal technical assistance and financial aid, if available; but without them, if they are not available) the medical testing and monitoring program previously approved by the Court ..." It is the State's contention that it was beyond the power of the trial judge to enter this order.
IHRAC cites two sources as authority for the court's order: the New Jersey Environmental Rights Act, N.J.S.A. 2A:35A-1 et seq., and Executive Order No. 40. The Environmental Rights Act provides that:
(a) Any person may maintain an action in a court of competent jurisdiction against any other person to enforce, or to restrain the violation of, any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment.
(b) Except in those instances where the conduct complained of constitutes a violation of a statute, regulation or ordinance which establishes a more specific standard for the control of pollution, impairment or destruction of the environment, any person may maintain an action in any court of competent jurisdiction for declaratory and equitable relief against any other person for the protection of the environment, or the interest of the public therein, from pollution impairment or destruction. [N.J.S.A. 2A:35A-4]
"Person" is defined in the Act to include "... individuals, the State, any political subdivision of the State and any agency or instrumentality of the State or of any political subdivision of the State." N.J.S.A. 2A:35A-3(a).
It is agreed by both parties that the Act was at least intended to enable private citizens to maintain environmental causes of action against any "person" in violation of the pollution laws. Thus a plaintiff like IHRAC has the right under the Act to sue Diamond Shamrock directly on notice to the State as required by N.J.S.A. 2A:35A-11. In addition, the State concedes that if it were a "polluter" it would be a proper party defendant under the Act. It is there that the parties diverge. Ironbound Health Rights Advisory Commission claims that the Act affords citizens the right to sue the State in its official capacity to compel it to undertake discretionary state action. The State, on the other hand, views the Act as affording a citizen the right to *174 obtain remedies against a polluter, including the State, but no right to compel the State to undertake discretionary action.
It seems to us that the primary, if not sole, thrust of the Act is the relationship of citizens to polluters. Indeed, its legislative history supports this reading by establishing that the focus of the Act was to
overturn the doctrine long established in our law that in order to have sufficient standing to sue for abatement or prevention of a public nuisance, a private person must show special damage peculiar to himself and distinct from that done to the public at large. Allen v. Bd. of Chosen Freeholders, 13 N.J. Eq. 68 (Ch. 1860); Morris and Essex R.R. v. Prudden, 20 N.J. Eq. 530 (E. & A. 1869); Humphreys v. Eastlack, 63 N.J. Eq. 136 (Ch. 1902). This bill could effectively grant to interested citizens the right to sue polluters without having to prove special injury to the plaintiffs. It would thus remedy what its supporters believe to be an unnecessary and obsolete impediment to enforcement of anti-pollution laws. [Report on Assembly Bill No. 1245 by the New Jersey Bar Association Committee on State Legislation, April 11, 1974]
We read the Act as intending to enhance the right of a private citizen to pursue a polluter. If, in a particular instance, the State does not act at all, the statute permits the citizen to sue the polluter directly to enforce laws which protect the environment. Even if the State takes action, a citizen may under some circumstances "supplement" that action again by directly pursuing the polluter. Twp. of Howell v. Waste Disposal, 207 N.J. Super. 80 (App.Div. 1986); Department of Transportation v. P.S.C. Resources, Inc., 159 N.J. Super. 154, 163 (Law Div. 1978). This is far different from IHRAC's interpretation of the Act as undergirding a citizen's suit to compel state action.
Even if we were to read the Act as contemplating a citizen's right to compel action by the State, such a right would be confined to the common law remedy of mandamus  the right to compel the State to perform a required nondiscretionary function.
Nothing in the federal cases cited by IHRAC supports a contrary view. Baughman v. Bradford Coal Co., Inc., 592 F.2d 215 (3rd Cir.1979), cert. denied, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 and Friends of the Earth v. Carey, 535 F.2d 165 (2 Cir.1976) interpreted federal statutes which specifically *175 codified the mandamus remedy. See Federal Clean Air Act, 42 U.S.C. § 7604; Federal Water Pollution Control Act, 33 U.S.C. § 1365. In so doing, those cases properly compelled the administrator of the executive agency to carry out its statutorily defined ministerial duties and did not mandate the performance of discretionary action.
Nor is our decision in Twp. of Howell, supra, of consequence to IHRAC's argument here. In that case, we allowed a municipality to pursue a polluter which had failed to comply with several administrative orders of the DEP. The full scope of that holding was to affirm what we reiterate today: that the Act broadened the rights of a citizen against a polluter. Thus we held that even when the DEP has acted against a polluter, a private party may, under some circumstances, supplement that action by pursuing the polluter further. We did not suggest that the Act allows a citizen to compel State action because that issue was not in the case. Certainly, nothing in Twp. of Howell, either directly or obliquely supports the contention that under the Act a court can compel an executive agency to perform a discretionary function.
Such an interpretation would, in our view, violate the doctrine of separation of powers as found in Article 3, par. 1 of the New Jersey Constitution:
The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution. [N.J. Const. of 1947, Art. III, ¶ 1.]
The purpose of this doctrine, which is the underpinning of the limitations inherent in a mandamus action, "is to safeguard the `essential integrity' of each branch of government." Gilbert v. Gladden, 87 N.J. 275, 281 (1981). It is aimed at preventing one branch of government from claiming power reserved to another and at avoiding the exercise of inordinate power by a single arm of government. Mt. Laurel Twp. v. Public Advocate of N.J., 83 N.J. 522 (1980). While a bright line delineating the *176 scope of the powers of each branch of government in every circumstance is not a realistic possibility, it is nevertheless clear that a judicial order compelling the executive to take discretionary action would violate the separation of powers.
Alternatively, IHRAC urges that if the Environmental Rights Act did not provide the trial judge with an independent basis to compel discretionary action by the DEP and the DOH, the order constituted a valid use of the remedy of mandamus to compel these State agencies to carry out their duties under the Governor's Executive Order of June 2 declaring a state of emergency. Switz v. Middletown Tp., 23 N.J. 580 (1957). The Executive Order to which we have previously adverted provided in relevant part that:
2. The Commissioner of the Department of Environmental Protection is hereby authorized and directed to take such emergency measures as he may determine to be necessary in order to fully and adequately protect the health, safety and welfare of the citizens of this State from any actual or potential threat or danger which may exist as a result of the possible contamination of the premises... at 80 Lister Avenue ... The Commissioner is further authorized to adopt ... such orders, rules and regulations as may be appropriate in order to carry out the purposes and directives contained herein.
3. The powers granted to the Commissioner of Environmental Protection hereby shall include, but not be limited to, the power to use, seize, impound, quarantine, restrict access to, or require the vacating of, or the making of modifications or improvements, temporary or permanent, to any real or personal property which in his judgment is reasonably required to abate the emergency caused by the possible presence of dioxin ...
The remedy of mandamus was available to the trial judge only to the extent that the Commissioner (to whom the order was directed) neglected a duty imposed upon him by the Executive Order. In response to the Executive Order, among other things, the Commissioner issued administrative orders directing vacuuming and cleanup of the areas in and around the Diamond Shamrock site, prohibited train traffic in the area and restricted the outdoor display of consumer goods at or near that location, negotiated administrative consent orders with the polluter to assist in and fund the clean-up, closed off the streets near the Shamrock site and removed the contaminated soil. Clearly, then it cannot be said that the Commissioner neglected his *177 duties under the Executive Order which was obviously aimed at eliminating the dioxin hazard at or near the Diamond Shamrock site. The Commissioner had no obligation under the Executive Order to address the medical condition of those previously exposed to dioxin. This is not to minimize the importance of this issue. It simply means that by the remedy of mandamus a court cannot substitute its judgment for that of the Executive as to how and under what circumstances the Executive will address a discretionary function. Obviously, if the DEP had left dioxin-contaminated soil exposed to the general public, a different conclusion would be reached and an action for mandamus would lie. That is not the situation here.
Reversed.
NOTES
[1] The original complaint did not name the DOH as a party nor was it later amended to do so. This was due to the trial judge's statement "that it was not necessary for someone to file an amendment to join the State Department of Health because really it seems to me once we have one major department in front of us, we really have the State in front of us. I expect the State and all its departments to respond."