SYLLABUS

This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**An Order to Show Cause to Address the Release of Certain Individuals Serving Sentences in State Prisons and Juvenile Facilities**
(M-1093-19) (084412)

**Argued May 27, 2020 -- Decided June 5, 2020**

**RABNER, C.J., writing for the Court.**

The Court considers issues relating to the impact of the coronavirus on individuals in state prison and juvenile facilities. The Office of the Public Defender and the American Civil Liberties Union of New Jersey (ACLU) applied directly to the Court for relief relating to the spread of the virus in both settings. They essentially asked the Judiciary to order a framework for the early release of several groups. Under the proposed framework, judges or court-appointed special masters would decide whether to grant release or a furlough in individual cases.

Two days after the Public Defender and ACLU wrote to the Court, the Governor issued Executive Order 124. The Order created a mechanism to identify inmates in state prison to be considered for parole or a medical furlough. It provides two tracks for review, directing the Parole Board to expedite its consideration of inmates for parole and the Commissioner of the Department of Corrections (DOC) to decide whether to grant a medical furlough -- an "emergency medical temporary home confinement." As of May 26, 2020, 607 inmates had been approved for home confinement or parole, and 337 had been released. By June 1, 2020, an additional 70 had been released.

Consistent with existing law, the Parole Board provided inmates with an individualized statement of reasons for cases in which it denied parole. Inmates denied a medical furlough received a two-sentence form letter from the Commissioner that notified them of the outcome but did not set forth any reasons. Inmates denied parole have an avenue for appeal; inmates denied a medical furlough under the Executive Order do not.

The decision whether to grant parole or to furlough an inmate rests largely with the Executive Branch. Although a court rule authorizes judges to amend a sentence and release an individual defendant because of illness or infirmity, R. 3:21-10(b)(2), neither the rule nor the other sources raised provide authority for the courts to establish and

1

oversee a broad-based program to release or furlough inmates in state prison. The Court therefore respectfully declines to grant the relief requested by the Public Defender and the ACLU.

As to the two tracks the Executive Order created to consider inmates for release, the Parole Board has been considering inmates in a manner consistent with existing practices. That includes various due process protections that attach to the parole process. Through a different process, the Commissioner, with help from the Review Committee, has been addressing medical furloughs.

**HELD:** Executive Order 124 creates a sufficient expectation of eligibility for release through a furlough program to call for certain due process protections. The Court adds to the Executive Order the protections summarized on pages 6 to 7 and detailed on pages 33 to 36 of the opinion to comport with due process. The Court also notes that inmates may challenge the DOC's action, a final agency decision, by seeking review before the Appellate Division. The agency's decision is entitled to deference on appeal. Individual inmates may also seek relief independently under Rule 3:21-10(b)(2). They do not have to exhaust the remedies available under the Executive Order before they may file a motion in court. As to sentences imposed on juveniles who are in the custody of the Juvenile Justice Commission (JJC), those individuals may seek relief from the court on an individual basis. To the extent the opinion calls for trial judges to rule on motions and the Appellate Division to review agency decisions, the Court exercises its supervisory authority to require that applications be heard and decided in a matter of days and urges the Commissioner and the Parole Board to act as expeditiously as possible.

**Section I** of the Court's opinion discusses the requested Order to Show Cause, which was proposed by the Public Defender and the ACLU. (pp. 8-10) The opinion next discusses Executive Order 124. (pp. 10-14) One month after the Order was issued, the Commissioner approved an Internal Management Procedure (IMP) to implement the Order. The Court reviews the IMP, notes measures DOC has adopted in correctional facilities to protect inmates and staff from COVID-19, and cites results from the Executive Order as reported by the Attorney General. (pp. 14-17)

**Section II** of the opinion considers the relief the Public Defender and ACLU seek relating to state prison inmates. The Court notes that the Executive Branch, and not the Judiciary, has primary control over the custody and care of adult inmates, the parole process, and inmate furloughs. (p. 18) The Court considers the sources that the Public Defender and ACLU have identified as conferring authority for the courts to act and finds no basis for a broad-based judicial furlough process in either State v. Boone, 262 N.J. Super. 220 (Law Div. 1992), or in Rule 3:21-10(b)(2). (pp. 19-21) Although the Court finds no source of authority for the Judiciary to direct a broader furlough program in the Rule, however, the Court notes that the Rule empowers individual inmates to apply for release from jail based on their physical condition. (p. 21) The Court agrees with the

2

Public Defender, ACLU, and Attorney General that inmates are not required to exhaust the administrative process under Executive Order 124 before they can apply for relief under Rule 3:21-10(b)(2).  (pp. 21-22)  The Court finds that Rule 3:21-10(b)(2) gives all inmates an opportunity to seek direct relief in court and requires an expedited briefing schedule for such motions, a return date within five days of filing, and a decision within the next three days.  (p. 23)  The Court declines to grant the relief requested and notes no Eighth Amendment challenge was raised.  (pp. 23-24)

Section III of the Court's opinion considers the Attorney General's argument that "furlough review is an administrative classification process" and is therefore not subject to due process, like a decision to transfer an inmate from one prison to another.  (pp. 24-25)  The Court disagrees and instead looks for guidance from the body of law relating to parole.  (p. 26)  Reviewing relevant case law, the Court explains that, although inmates have no constitutional right to parole, eligibility for parole under state law can create a protectible liberty interest if a state statute creates a legitimate or sufficient expectation of eligibility for parole.  (pp. 26-28)  In State Parole Board v. Byrne, 93 N.J. 192, 203 (1983), the Court held that New Jersey's Parole Act creates a sufficient expectancy of parole eligibility to entitle prisoners to some measure of constitutional protection with respect to parole eligibility decisions.  (pp. 28-29)  The Court examines the language of Executive Order 124 and finds that it creates a liberty interest in the furlough decision for the inmates it covers and that those inmates are therefore entitled to some measure of constitutional protection.  (pp. 29-31)

Section IV of the opinion addresses what process is due under the circumstances.  After performing the balancing test set forth in Mathews v. Eldridge, 424 U.S. 319, 335 (1976), the Court concludes that an adversarial hearing with counsel and a detailed statement of reasons is not required.  (pp. 31-33)  Instead, as in Byrne, the Court requires notice, an opportunity to be heard and respond, and a written statement of reasons.  (p. 33)  On pages 33 to 36, the Court describes those requirements in detail.  The Court then notes that the agency's decision is subject to appellate review under a deferential standard, and sets forth an expedited timeframe for Appellate Division proceedings.  (pp. 36-38)  The Court declines to compel the Commissioner or the Parole Board to act within a defined number of days, noting that the record does not demonstrate that the agency has neglected to implement the Executive Order.  (pp. 38-40)  The Court urges both the Commissioner and the Board to act expeditiously, orders some specific measures going forward, and strongly encourages them to publish and regularly update relevant data. (pp. 41-42)

Section V considers the relief requested as to juveniles under the custody of the JJC.  The Judiciary retains jurisdiction over the disposition of juvenile matters, and courts can change or modify an order of disposition at any time.  (pp. 42-43)  The Court reviews the impact of the coronavirus on JJC facilities and notes that youths in JJC custody can apply to the court and ask for their disposition to be modified.  (pp. 43-44)  The Court

3

provides guidance for such proceedings and requires an expedited schedule.  (pp. 42-44)  The Court does not address the request that all custodial terms on certain juveniles be modified to "time served" because that argument was advanced exclusively by an amicus curiae.  (p. 45)

The Court concludes that the arguments raised do not provide a basis for the requested relief and recognizes the role the other branches of government have.  The Executive and Legislative Branches retain the authority to enact policy changes in response to the spread of COVID-19 in state prisons and juvenile facilities.

**The matter is remanded to the DOC for further proceedings.**

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in CHIEF JUSTICE RABNER's opinion.**

SUPREME COURT OF NEW JERSEY

M-1093 September Term 2019

084412

In the Matter of the Request to
Modify Prison Sentences, Expedite
Parole Hearings, and Identify
Vulnerable Prisoners

On an Order to Show Cause to Address the Release
of Certain Individuals Serving Sentences in State
Prisons and Juvenile Facilities.

| Argued | Decided |
|--------|---------|
| May 27, 2020 | June 5, 2020 |

Joseph E. Krakora, Public Defender, argued the cause for
the Office of the Public Defender (Joseph E. Krakora,
Public Defender, attorney; Joseph E. Krakora, Joseph J.
Russo, Assistant Public Defender, Alison Perrone, First
Assistant Deputy Public Defender, and Laura B. Lasota,
Assistant Deputy Public Defender, on the briefs).

Alexander Shalom argued the cause for the American
Civil Liberties Union of New Jersey (American Civil
Liberties Union of New Jersey Foundation, attorneys;
Alexander Shalom and Jeanne LoCicero, on the briefs).

Laura Cohen argued the cause for amicus curiae Rutgers
Criminal and Youth Justice Clinic (Rutgers Criminal and
Youth Justice Clinic, attorneys; Laura Cohen, Elana Wilf,
and Tyler Dougherty, on the brief).

Stephanie J. Cohen, Assistant Attorney General, argued
the cause for the Office of the Attorney General, the
Department of Corrections, and the State Parole Board
(Gurbir S. Grewal, Attorney General, attorney; Stephanie

J. Cohen, Kai W. Marshall-Otto, Deputy Attorney General, Tim Sheehan, Deputy Attorney General, and Michael T. Moran, Deputy Attorney General, on the briefs).

Joseph Paravecchia, Assistant Mercer County Prosecutor, argued the cause for the County Prosecutors Association of New Jersey (Angelo J. Onofri, President, County Prosecutors Association, attorney; Joseph Paravecchia, Laura Sunyak, Assistant Mercer County Prosecutor, John McNamara, Jr., Chief Assistant Morris County Prosecutor, Jeffrey L. Weinstein, Assistant Hunterdon County Prosecutor, Jaimee M. Chasmer, Assistant Bergen County Prosecutor, and Frank J. Ducoat, Assistant Essex County Prosecutor, on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

The COVID-19 pandemic has presented many serious challenges. We now consider issues relating to the impact of the coronavirus on individuals in state prison and juvenile facilities.

As of June 1, 2020, out of a total population of 15,302 inmates in state prison, 1720 had tested positive for the virus, about 192 had been hospitalized, and 46 had died. Up to 737 out of 8008 staff members had also tested positive. Although no residents under the custody of the Juvenile Justice Commission

2

have died, 28 residents out of a total population of 274 had tested positive.[1]

Those statistics speak for themselves and reveal how critical the situation is.

The Office of the Public Defender and the American Civil Liberties Union of New Jersey (ACLU) applied directly to the Court for relief relating to the spread of the virus in both settings. They essentially asked the Judiciary to order a framework for the early release of several groups: adults and juveniles serving a sentence that will expire in the next year; individuals eligible for parole; and any defendant who is particularly vulnerable to COVID-19. Under the proposed framework, judges or court-appointed special masters would decide whether to grant release or a furlough in individual cases after considering any objections.

On April 10, 2020, two days after the Public Defender and ACLU wrote to the Court, the Governor issued Executive Order 124. The Order created a mechanism to identify inmates in state prison to be considered for parole or a medical furlough: inmates who are at least sixty years old; who possess an underlying medical condition that increases their risk of death or serious injury from COVID-19; who were denied parole within the last year; whose sentence

---

[1] Unless otherwise noted, the Attorney General provided the statistics that appear in this opinion in the form of certifications from officials at the Department of Corrections, the State Parole Board, and the Juvenile Justice Commission.

3

will end within ninety days; or who will be eligible for parole within ninety days.

The Executive Order provides two tracks for review. It directs the Parole Board to expedite its consideration of inmates for parole. It also directs the Commissioner of the Department of Corrections (DOC) to decide whether to grant a medical furlough -- an "emergency medical temporary home confinement" -- if he "is satisfied that the proposed conditions of confinement appropriately safeguard the health and safety of the inmate, the general public, and any victims of the inmate's offense." In making that decision, the Commissioner must consider recommendations prepared by the newly created Emergency Medical Review Committee (Review Committee). Its recommendations include the views of the prosecutor and the victim or next of kin in each case, but not the position of the inmate.

Pursuant to the Executive Order, 3050 inmates were identified for consideration. Hundreds of them declined to be considered, which reduced the total number to 2500. As of May 26, 2020, 607 inmates had been approved for home confinement or parole, and 337 had been released. By June 1, 2020, an additional 70 had been released.

Consistent with existing law, the Parole Board provided inmates with an individualized statement of reasons for cases in which it denied parole.

4

Inmates denied a medical furlough received a two-sentence form letter from the Commissioner that notified them of the outcome but did not set forth any reasons. Inmates denied parole have an avenue for appeal; inmates denied a medical furlough under the Executive Order do not.

The decision whether to grant parole or to furlough an inmate rests largely with the Executive Branch. The Legislature empowered the Parole Board to make decisions about parole, see N.J.S.A. 30:4-123.45 to -123.76, and gave the Commissioner authority to decide whether to furlough inmates, see N.J.S.A. 30:4-91.3. Although a court rule authorizes judges to amend a sentence and release an individual defendant because of illness or infirmity, R. 3:21-10(b)(2), neither the rule nor the other sources raised provide authority for the courts to establish and oversee a broad-based program to release or furlough inmates in state prison. We therefore respectfully decline to grant the relief requested by the Public Defender and the ACLU.

As to the two tracks the Executive Order created to consider inmates for release, the Parole Board has been considering inmates in a manner consistent with existing practices. That includes various due process protections that attach to the parole process. Through a different process, the Commissioner, with help from the Review Committee, has been addressing medical furloughs. In that regard, the Governor's Order created a commendable path for the

5

emergency release of certain inmates from prison during this time of crisis, with safeguards in place to protect the public. Inmates will be confined at home subject to various restrictions.

We hold that because the Order creates a sufficient expectation of eligibility for release through a furlough program, the Order calls for certain due process protections. See Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 12 (1979); State Parole Bd. v. Byrne, 93 N.J. 192, 203 (1983). At a minimum, due process requires notice and an opportunity to be heard. Doe v. Poritz, 142 N.J. 1, 106 (1995). We add the following protections to the Executive Order to comport with due process:

(1) inmates are to be afforded an opportunity to present a written statement in support of their request to be furloughed in the same way that prosecutors and victims are allowed to express their views. Inmates may proceed on their own or with the help of volunteer lawyers. The Public Defender's Office has volunteered its assistance and should be provided with the lists of eligible inmates generated under the Order, under seal, subject to a protective order;

(2) the Commissioner is to provide a statement of reasons to inmates who are denied a medical furlough to help guard against mistakes and arbitrary decisionmaking and allow for meaningful judicial review if it is sought; and

6

(3) inmates are to be given an opportunity to respond in order to try to satisfy the Commissioner's concerns and cure any mistakes. The Commissioner shall consider each response before issuing a final decision.

Inmates may challenge the DOC's action, a final agency decision, by seeking review before the Appellate Division. See Acoli v. State Parole Bd., 224 N.J. 213, 222-23 (2016); R. 2:2-3(a)(2). The agency's decision is entitled to deference on appeal. In re State & Sch. Emps.' Health Benefits Comm'ns' Implementation of Yucht, 233 N.J. 267, 279 (2018).

Individual inmates may also seek relief independently under Rule 3:21-10(b)(2). They do not have to exhaust the remedies available under the Executive Order before they may file a motion in court.

As to sentences imposed on juveniles who are in the custody of the JJC, the Judiciary retains jurisdiction over their cases and has the authority to modify dispositions. N.J.S.A. 2A:4A-43, -45. Those individuals may seek relief from the court on an individual basis. Among other relevant factors, courts are to consider the ongoing COVID-19 crisis and its impact on the individual's health condition.

We add an overriding concern. Because of the risks COVID-19 poses, which are amplified in jail settings, each day matters. To the extent this opinion calls for trial judges to rule on motions and the Appellate Division to

7

review agency decisions, we exercise the Court's supervisory authority to require that applications be heard and decided in a matter of days. For the same reason, we urge the Commissioner and the Parole Board to act as expeditiously as possible. The Executive Order itself calls for an expedited process; the additional measures imposed, which are not inconsistent with the Order's purpose, should not extend the time for review in a notable way. We urge that the entire process -- review for approval <u>and</u> release -- be carried out carefully and expeditiously because the stakes are so high.

## I.

## A.

On March 19, 2020, the Public Defender brought an application before this Court for an Order to Show Cause. He sought to commute or suspend certain county jail sentences as a result of the crisis COVID-19 has created. The Court directed the parties -- the Public Defender, ACLU, Attorney General, and County Prosecutors Association -- to engage in mediation before the Honorable Philip S. Carchman, retired Presiding Judge of the Appellate Division and Acting Director of the Administrative Office of the Courts. They promptly reached an agreement. On March 22, 2020, the Court entered a consent order that led to the release of nearly 700 inmates in about a week.

8

On April 8, 2020, the Public Defender and the ACLU wrote to this Court and proposed a second Order to Show Cause. The proposed Order sought the release of all defendants serving a sentence in state prison or in the custody of the Juvenile Justice Commission (JJC) with a maximum release date within the next 12 months. The parties asked the Court to modify those sentences pursuant to Rule 3:21-10(b)(2). Defendants convicted or adjudicated of violent crimes subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, other than second-degree robbery and second-degree burglary, were to be excluded.

Under the proposed Order, the County Prosecutor or Attorney General could file written objections to the early release of a defendant. Any objections would be addressed by judges or court-appointed special masters, who were to presume that sentences should be modified unless they found that public safety concerns overcame the presumption. Finally, in cases that involved domestic violence or other crimes with a known victim, victims would receive notice of an inmate's early release.

The proposed Order also asked the Court to direct the State Parole Board to "[e]xpedite consideration of parole-eligible defendants who are older than 60 or at particularly high risk of death from COVID-19 as a result of other health concerns." Defendants denied parole within the last year would have their cases reconsidered in light of the pandemic.

Next, the proposed Order called for the DOC to identify for the Court and counsel a list of defendants "particularly vulnerable to COVID-19 as a result of age or health condition." That list would exclude defendants convicted of a crime pursuant to N.J.S.A. 2C:11-3 (murder), 2C:11-4 (manslaughter), 2C:14-2 (sexual assault), 2C:15-1 (robbery), 2C:13-1 (kidnapping), or 2C:12-1(b) (aggravated assault). If neither the County Prosecutor nor the Attorney General filed an objection, the DOC would grant eligible defendants a medical furlough. If the DOC did not grant a furlough, this Court was asked to modify defendants' sentences to allow for their immediate release, pursuant to Rule 3:21-10(b)(2). Once again, judges or special masters would resolve any objections, and notice would be provided to victims.

On April 8, 2020, the Court responded by letter to the four parties to the Consent Order and the agency heads of the DOC, Parole Board, and JJC. The Court did not grant the application at the time and made Judge Carchman available to mediate.

B.

Two days later, on April 10, 2020, Governor Philip D. Murphy issued Executive Order 124, pursuant to the Civilian Defense and Disaster Control

10

Act, N.J.S.A. App. A:9-30 to -63, and the Emergency Health Powers Act, N.J.S.A. 26:13-1 to -31.

The Executive Order highlights various safety and health issues presented by the COVID-19 pandemic. For example, the Order cites guidance from the Centers for Disease Control and Prevention to practice social distancing and avoid mass gatherings; acknowledges that certain individuals in DOC custody may face a higher risk of death if they contract COVID-19 because of their age or underlying medical conditions; and notes that "DOC has finite capacity within its facilities to provide medical care to inmates who contract COVID-19." Because of the challenges of maintaining social distancing measures in jails, the Executive Order also acknowledges that "it may be necessary to take certain emergency steps in order to temporarily remove [vulnerable] individuals from congregate custody."

To address those health and safety concerns, the Executive Order directed DOC to "expeditiously identify" four categories of inmates for referral to the Parole Board and the Review Committee: inmates who are age 60 or older and possess underlying medical conditions that increase the risk of death or serious injury from COVID-19 (List 1); inmates who are either age 60 or older or possess underlying medical conditions that increase the risk of death or serious injury from COVID-19 (List 2); inmates denied parole in the

11

past year who are not on Lists 1 or 2 (List 3); and inmates serving a sentence with either a maximum release or parole eligibility date within 90 days, who are not on Lists 1, 2, or 3 (List 4).

DOC's Chief of Staff certified to the Court that a maximum 90-day release date was preferable to a one-year period because inmates reaching their maximum sentence within a year "would be most in need of robust reentry planning before release," which is "more likely to be considerably further along" three months out.

Inmates not allowed to participate in a furlough program under N.J.S.A. 30:4-91.3(b) or serving a sentence for an offense subject to the No Early Release Act cannot be included on the lists. Both exclusions apply to defendants convicted of more serious offenses.

The Order directed DOC to submit supplemental lists, at least once a week, that included any additional inmates "DOC subsequently concludes face a heightened risk of death or serious injury from COVID-19 based on their age and/or underlying medical conditions."

When compiled, the four lists included 3050 inmates: 55 on List 1; 1051 on List 2; 921 on List 3; and 1023 on List 4. Some inmates on the lists either declined to be considered for a medical furlough or were otherwise released.

As a result, 2500 inmates remained on the lists for DOC to consider: 51, 927, 809, and 713 inmates, respectively.

The Executive Order directed DOC to produce the lists immediately to the Division of Criminal Justice and the County Prosecutors. The prosecutors had five days to (1) notify any victims or next of kin about the possibility of an inmate's release, and (2) submit the views of the prosecutor and any victims or next of kin about the possibility of release to the Parole Board and the Review Committee. The Executive Order contains no provision for inmates to submit their views.

The Order also required DOC to promptly produce all lists to the Parole Board and the Review Committee. From that point, the Order provides two tracks for review. The Parole Board "shall expedite consideration of . . . inmates for parole" and can conduct hearings telephonically or by video conference. Priority is given to inmates on List 1, followed by Lists 2, 3, and 4.

At the same time, the DOC Commissioner must decide whether to grant inmates "emergency medical home confinement" -- a medical furlough. In doing so, he considers recommendations from the Review Committee established by the Executive Order.

13

The Review Committee has seven days to prepare a recommendation once it receives a list. Among other things, its recommendation includes the views of the prosecutor and any victim or next of kin, identifies a community sponsor and supervision plan, proposes conditions on home confinement and restrictions for travel outside the home, and verifies the availability of appropriate housing and medical and social services.

The Commissioner has three days to act on the recommendation. The Executive Order states, "[t]he Commissioner shall not authorize temporary home confinement for an inmate unless the Commissioner is satisfied that the proposed conditions of confinement appropriately safeguard the health and safety of the inmate, the general public, and any victims of the inmate's offense."

Before an inmate is released, DOC is required to issue the inmate a temporary photo identification and help the inmate complete and submit applications for services and benefits.

C.

One month after the Executive Order was issued, the Commissioner approved an Internal Management Procedure (IMP) to implement the order. As part of the IMP, each inmate identified on a list is interviewed. Inmates who want to be considered for a medical furlough then fill out an application

14

that has a place for the inmate's name, age, medications, the address and phone numbers for the house where the inmate proposes to live, and the inmate's relationship to that site. The form also asks whether the community sponsor has agreed (a) to allow the inmate to reside there during the furlough and (b) to provide transportation to and from jail. The application has no space for inmates to express their views or advocate for their release.

At the same time, DOC collects various documents relating to the inmates' offense, psychological evaluations, and progress notes. The agency also reviews files for active investigations and any intelligence reports.

Under the IMP, parole officers visit the proposed home and interview household members to evaluate whether it is suitable for a furlough. Among other factors, they consider whether a co-defendant or victim resides in the home and whether anyone there has tested positive for COVID-19.

Inmates who are released are subject to electronic monitoring and have to wear a monitoring bracelet. They must also call into DOC twice a day.

To be released, approved inmates must be tested for COVID-19 and must test negative.

## D.

The Attorney General describes various measures DOC has adopted in correctional facilities to protect inmates and staff from COVID-19. Key to its

15

efforts, DOC represents that it will test all inmates. On May 28, 2020, DOC reported a total of 15,302 inmates; 13,017 had been tested by June 1, 2020. 1720 inmates (13.2 percent) tested positive for COVID-19. Forty-six inmates have died. The death rate was at its highest in mid to late April, and it declined in May.

The virus has afflicted DOC staff members as well. On May 26, 2020, DOC had 8008 staff members. DOC had tested 4274 of them, and 130 tested positive. Staff members, though, independently reported 607 positive tests.

E.

The Attorney General reports the following results from the Executive Order as of May 26, 2020: 607 inmates had been approved for home confinement or parole, and 337 had been released. Approximately 70 additional inmates had been released by June 1, 2020, bringing the total number released to about 407.

DOC's Chief of Staff certifies that the agency has completed its review of all inmates on the lists who requested to be furloughed. 183 had been placed on home confinement, and 67 had been approved but not yet released by May 26, 2020. Those not yet released awaited test results, medical clearance, or housing review, or had not been released for some other reason. As of June 1, 2020, 25 additional inmates had been furloughed.

16

The Director of Release for the Parole Board certified the following as of May 26, 2020: the Parole Board had released 174 inmates on parole; 271 had been granted parole or had their prior parole denial vacated, but had not yet been released; and a total of 2156 inmates "ha[d] been denied parole, had their prior parole denial affirmed upon reconsideration, ha[d] not yet reached their parole eligibility date, or ha[d] not yet been considered for parole." Gregorio Cert., 5/26/20, ¶ 4. The group of inmates not yet considered totaled 256.[2] As of June 1, 2020, approximately 45 additional inmates had been released on parole, and 50 more had been awarded parole but not yet released.

There are duplicate names among those considered for parole and medical furloughs, which accounts for certain discrepancies.

## II.

We first consider the relief the Public Defender and ACLU seek relating to state prison inmates. Because juveniles present different concerns, we discuss them separately below.

---

[2] It is unclear how many inmates had not yet reached their parole eligibility date, so we cannot be certain how many of the remaining 1900 inmates had been denied parole or reconsideration of parole. That number is at least 751. Gregorio Cert., 5/19/20, ¶ 41(f).

A.

The Executive Branch, and not the Judiciary, has primary control over the custody and care of adult inmates, the parole process, and inmate furloughs.

The Legislature established the Department of Corrections "to provide for the custody, care, discipline, training and treatment of adult offenders" in state prison or on parole. N.J.S.A. 30:1B-3. The Department is a part of the Executive Branch. See N.J.S.A. 30:1B-4.

The DOC Commissioner has statutory authority to furlough inmates for medical reasons. N.J.S.A. 30:4-91.3(a). The State Parole Board, a division of the DOC, oversees the parole process. N.J.S.A. 30:4-123.47(a), -123.48.

Consistent with that statutory authority, Executive Order 124 directs the Parole Board to consider eligible inmates for parole on an expedited basis, and the Commissioner to consider them promptly for a medical furlough. That process has been underway since April.

Despite their differences, there is a fair amount of overlap between the relief the Public Defender and the ACLU request and the mechanism the Governor set in motion. The approaches also differ in key ways -- for example, whether inmates with ninety days or one year left on their sentence

18

should be considered for release, and whether executive branch agencies or the courts should decide who will be released.

The Public Defender and ACLU identify State v. Boone, 262 N.J. Super. 220 (Law Div. 1992), and Rule 3:21-10(b)(2) as sources of authority for the courts to act. We consider each in turn.

1.

The Law Division's decision in Boone does not afford a basis for a broad-based judicial furlough process. Boone involved an extraordinary situation that the Commissioner brought to the court's attention: an inmate with a rare and potentially dangerous condition needed to be examined quickly for possible aortic replacement surgery, which could be performed only at a hospital in Texas. 262 N.J. Super. at 222. The Commissioner had no statutory authority to grant a furlough outside of New Jersey, so he asked the court to intervene. Ibid. The trial judge relied on the court's "inherent authority to act to preserve life" and "granted a judicial furlough." Id. at 223. At the same time, the court noted "this power should be sparingly utilized in the very rarest of cases." Id. at 224.

The trial judge went out of his way to commend the Commissioner for coming to court to seek relief under the circumstances. Id. at 224 n.1. The

Law Division's decision cannot be read as a basis for courts to order and oversee a wide-ranging furlough program in place of the Commissioner.

2.

Rule 3:21-10(b)(2) likewise does not give the Judiciary broad authority to oversee a furlough program. The Rule provides that "[a] motion may be filed and an order may be entered at any time . . . amending a custodial sentence to permit the release of a defendant because of illness or infirmity of the defendant."

Courts apply a balancing test to determine whether this "extraordinary relief" should be granted. State v. Priester, 99 N.J. 123, 135 (1985). Among other factors, courts consider "the serious nature of the defendant's illness and the deleterious effect of incarceration on the prisoner's health"; "the availability of medical services in prison"; "the nature and severity of the crime, the severity of the sentence, the criminal record of the defendant, [and] the risk to the public if the defendant is released." Id. at 135-37. An inmate must also show "that a change of circumstances" has occurred. Id. at 136.

The first two factors -- the nature of the inmate's illness and the effect of continued incarceration on his health -- are "[t]he predicate for relief." Id. at 135. To prevail on a motion, inmates must therefore present evidence of both an "illness or infirmity" -- a physical ailment or weakness -- and the increased

20

risk of harm incarceration poses to that condition. A generalized fear of contracting an illness is not enough.

We find that the worldwide pandemic that has afflicted New Jersey and its prison system amounts to a change in circumstances under the Rule. See Comm. for Pub. Counsel Servs. v. Chief Justice of the Trial Court, 142 N.E.3d 525, 533 (Mass. 2020) (noting the Supreme Court of Washington declared that the "pandemic shall be presumed to be a 'material change in circumstances' for the purpose[] of . . . motions for bail review").

The language of the Rule empowers individual inmates to apply for release from jail based on their physical condition. The Rule, however, is not a source of authority for the Judiciary to direct a broader furlough program.

We agree with the Public Defender, ACLU, and Attorney General that inmates are not required to exhaust the administrative process under Executive Order 124 before they can apply for relief under Rule 3:21-10(b)(2). The principle that litigants must first exhaust administrative remedies is "designed to allow administrative bodies to perform their statutory functions in an orderly manner without preliminary interference from the courts." Griepenburg v. Township of Ocean, 220 N.J. 239, 261 (2015) (quoting Brunetti v. Borough of New Milford, 68 N.J. 576, 588 (1975)). Although there is "a strong presumption favoring the" doctrine, it is not an absolute

requirement.  Ibid. (quoting Brunetti, 68 N.J. at 588); see also Abbott v. Burke, 100 N.J. 269, 297 (1985) ("the preference for exhaustion of administrative remedies is one 'of convenience, not an indispensable pre-condition,'" except for certain situations (quoting Swede v. City of Clifton, 22 N.J. 303, 315 (1956))).

Among other exceptions, see Griepenburg, 220 N.J. at 261, the exhaustion doctrine "will be waived where the 'interest of justice so requires.'"  Brunetti, 68 N.J. at 589 (quoting Ward v. Keenan, 3 N.J. 298, 308 (1949)); see also R. 4:69-5 ("Except where it is manifest that the interest of justice requires otherwise, actions under R. 4:69 shall not be maintainable as long as there is available a right of review before an administrative agency which has not been exhausted."  (emphasis added)).

Executive Order 124 does not cover all state prison inmates.  An inmate with a serious illness who has ten years left on his sentence and will not be eligible for parole soon -- and is not covered by the Order -- can apply directly to the court for relief today.  Given the spread of COVID-19 in jail, it would not serve the public interest to require a seriously ill inmate with fewer than ninety days left on his sentence -- who is covered by the Order -- to have to wait until DOC review is completed before he can apply to the court.

22

We find that Rule 3:21-10(b)(2) gives all inmates an opportunity to seek direct relief in court.  Because of the urgent nature of the ongoing crisis, we direct that motions brought by individual inmates under Rule 3:21-10(b)(2) be resolved in an expedited manner.  We exercise the Court's supervisory power over the administration of the court system to require an expedited briefing schedule for such motions, a return date within five days of filing, and a decision within the next three days.  See N.J. Const. art. VI, § 2, ¶ 3.

B.

Because the bases the Public Defender and the ACLU rely on do not support the relief requested, we respectfully decline to grant it.[3]  We note that

---

[3]  In response to an earlier application of the Public Defender and the ACLU, the Court entered a consent order designed to reduce the county jail population, under certain conditions, to mitigate the risks from the spread of COVID-19.  In re Request to Commute or Suspend County Jail Sentences, ___ N.J. ___, ___ (2020), available at https://njcourts.gov/notices/2020/ n200323a.pdf.  The order led to the prompt release of nearly 700 inmates.

The Court acted after the Attorney General, County Prosecutors Association, Public Defender, and ACLU engaged in mediation and agreed to a thoughtful plan that addressed inmates serving county jail sentences as a condition of probation or as a result of a municipal court conviction.  In general, the underlying offenses in those cases were not as serious as the charges for which inmates in state prison have been convicted.

Part of the consent agreement called for judges to resolve objections to release in individual cases.  Unlike in this matter, the Executive voiced no concerns about separation of powers.  See N.J. Const. art III, ¶ 1.  Just the opposite, the Executive Branch responsibly asked the Judiciary to step in and resolve disputes between prosecutors and defendants in particular cases -- a

23

no challenge has been leveled under the Eighth Amendment.  The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on prison officials to "provide humane conditions" and "'take reasonable measures to guarantee the safety of the inmates.'"  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).  A prison official violates the Eighth Amendment if an alleged deprivation is "sufficiently serious," when viewed objectively, and the official acted with a "sufficiently culpable state of mind" like "deliberate indifference."  Id. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 297, 298, 302-03 (1991)).

Here, we are not faced with an Eighth Amendment challenge.  The Governor has issued a comprehensive order to which we now turn.

## III.

The Attorney General argues that "the furlough review is an administrative classification process" and is therefore not subject to due process.  In advancing that argument, the State contends that the decision whether an inmate can serve part of his sentence at home is much like a

---

common role for the courts.  Had the parties made a similar request here, the Judiciary would have been faced with a very different situation at this time of crisis.

24

decision to transfer an inmate from one prison to another. In both instances, the inmate remains in the custody of the DOC.

Because inmates do not have a protected liberty interest in their "housing assignment" or custody status, the State submits, no additional due process is required. For support, the State relies on <u>Szemple v. Department of Corrections</u>, 384 N.J. Super. 245, 249 (App. Div. 2006) (prisoners do not have "a liberty interest" under the due process clause in "remaining free from transfer to more restricted facilities"); <u>Moore v. Department of Corrections</u>, 335 N.J. Super. 103, 109 (App. Div. 2000) (change in inmate's custody status from minimum to medium "did not trigger due process safeguards"); and <u>Shabazz v. Department of Corrections</u>, 385 N.J. Super. 117, 124 (App. Div. 2006) (inmate transferred from halfway house to jail "did not have a constitutionally protected interest in his initial placement"), among other decisions. The State also cites <u>Sandin v. Conner</u>, 515 U.S. 472, 486 (1995), in which the Supreme Court concluded that placement of an inmate in disciplinary segregation did not create a protected liberty interest. The Court observed that due process safeguards are "generally limited to freedom from restraint" which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Id.</u> at 484.

25

We disagree with the proposition at the core of the above argument: that releasing an inmate from jail and allowing him to remain at home during a pandemic is like a transfer to a different jail or a change in an inmate's custody status. The argument overlooks the reality of what the Executive Order achieves: inmates are released from jail and sent home, where they are subject to confinement and other restrictions.

We instead look for guidance from the body of law relating to parole, a process through which inmates are also released from jail and are subject to restrictions and supervision. See Morrissey v. Brewer, 408 U.S. 471, 482 (1972); N.J.S.A. 30:4-123.45 to -123.76. Although not a perfect match -- particularly because furloughed inmates are confined to home and not free to go about -- parole is a more apt analogy than the transfer of an inmate between prisons.

Inmates have no constitutional right to parole. Greenholtz, 442 U.S. at 7; Byrne, 93 N.J. at 208; In re Parole Application of Trantino, 89 N.J. 347, 363 n.5 (1982). And the due process clause is not implicated "simply because the state provides for the possibility of parole." Trantino, 89 N.J. at 363 n.5; see also Greenholtz, 442 U.S. at 11. But a protected liberty interest can nonetheless arise in the parole context. See Byrne, 93 N.J. at 202.

As the Supreme Court explained in Morrissey, courts examine the weight and nature of an individual's liberty interest to determine if it is within the contemplation of the Fourteenth Amendment's due process clause. 408 U.S. at 481. With that in mind, the Court considered whether due process requirements applied to the revocation of parole. The Court noted that parolees rely "on at least an implicit promise that parole will be revoked only if [they] fail[] to live up to the parole conditions." Id. at 482. The Court concluded that the valuable nature of the liberty interest and the grievous loss termination inflicts on parolees "call[] for some orderly process" under the Fourteenth Amendment. Ibid.

The same type of analysis applies to revocation of probation, see Gagnon v. Scarpelli, 411 U.S. 778 (1973), and forfeiture of good-time credits for serious misbehavior, Wolff v. McDonnell, 418 U.S. 539 (1974); see also Jamgochian v. State Parole Bd., 196 N.J. 222, 241 (2008). Because the State grants a prisoner or probationer a liberty interest in those contexts, the interest is protected by the due process clause.

Parole revocation is, of course, different from a decision not to release a prisoner on parole. Greenholtz, 442 U.S. at 9. One deprives a person of liberty, and the other denies the individual the "conditional liberty [he] desires." Ibid. The decision in Greenholtz, which this Court followed in

27

Byrne, identified the standard to determine when eligibility for parole under state law creates a protectible liberty interest: whether a state statute creates a legitimate or sufficient expectation of eligibility for parole. Greenholtz, 442 U.S. at 12; Byrne, 93 N.J. at 203; see also Vitek v. Jones, 445 U.S. 480, 489 (1980).

In Greenholtz, the Supreme Court found that Nebraska's parole statue "create[d] a protectible expectation of parole" by directing that the Parole Board "shall order [an eligible offender's] release unless" the Board finds certain facts. 442 U.S. at 11-12. Even though inmates had no right to parole under the statute, because the law's structure and language created "the expectancy of release," inmates were entitled to due process protections. Id. at 12.

Similarly, in Byrne, this Court held that New Jersey's "Parole Act creates 'a sufficient expectancy of parole [eligibility] to entitle [prisoners] to some measure of constitutional protection with respect to parole [eligibility] decisions.'" 93 N.J. at 203 (alterations in original) (quoting Vitek, 445 U.S. at 489). The Court's analysis focused on two parts of the Parole Act: (1) N.J.S.A. 30:4-123.51(j), which outlined when inmates "shall become primarily eligible for parole" but also provided they would not be eligible at that time if the prosecutor or the "court advise[d] the [B]oard that the punitive

28

aspects" of their sentences would "not have been fulfilled"; and (2) N.J.S.A. 30:4-123.53(a) (1983), which stated that inmates "shall be released on parole at the time of parole eligibility, unless . . . there is a substantial likelihood that the inmate will commit a crime under the laws of this State if released on parole at such time."

This Court observed that the language in N.J.S.A. 30:4-123.53(a) -- "shall be released . . . unless" -- "parallel[ed] the language that the Greenholtz Court found created a protected expectation in that case." 93 N.J. at 206. As a result, this Court concluded the Parole Act "creates a legitimate expectation of parole eligibility." Ibid. By doing so, the Act created "a liberty interest in parole" that invokes due process protections. Ibid.

"Only a few, basic procedures [were] required" under the circumstances "to deal with the risks of erroneous or arbitrary determinations":

> notice of the pendency of the parole disposition, a statement by the objecting judge or prosecutor of the reasons why the punitive aspects of the sentence have not been fulfilled, and the opportunity for the prisoner to respond in writing to that statement of reasons.
>
> [Id. at 211.]

Executive Order 124 provides for an eligible inmate's emergency release from prison to home during this health crisis. As is true for parole, inmates have no right to release under the Order. We therefore examine the language

29

of the Executive Order to see if it creates a sufficient expectation of eligibility for release to warrant due process protection.

Paragraph 8 of the Executive Order states the relevant standard:

> Within three days of receiving a recommendation from the Committee, the Commissioner shall decide whether to grant an emergency medical home confinement pursuant to his authority under N.J.S.A. 30:4-91.3. <u>The Commissioner shall not authorize temporary home confinement for an inmate unless the Commissioner is satisfied that the proposed conditions of confinement appropriately safeguard the health and safety of the inmate, the general public, and any victims of the inmate's offense</u>.

[(emphasis added).]

The Attorney General has identified no other considerations relevant to the Commissioner's release decision. Therefore, although stated in the negative, the Executive Order can be fairly read to convey that inmates shall be eligible for a medical furlough unless the Commissioner finds the stated conditions are not met. That interpretation is consistent with the aim of the Governor's Executive Order as a whole: to release eligible inmates from jail during the pandemic unless their release would pose health or safety concerns to the inmate, the public, or any victims.

The Executive Order provides neither a right to release nor a presumption of release. The Commissioner exercises discretion when he

30

decides whether to grant a medical furlough, just as the Parole Board does when it considers an inmate for parole.  See Acoli, 224 N.J. at 222 (regarding parole).  But, similar to the parole statutes reviewed in Greenholtz and Byrne, the Executive Order creates a legitimate and sufficient expectation of eligibility for a furlough, subject to health and safety concerns, for the 3000 inmates who appear on the lists the DOC generated.  Because the Executive Order creates a liberty interest in the furlough decision for those inmates, they are "entitled to some measure of constitutional protection."  Greenholtz, 442 U.S. at 12; see also Byrne, 93 N.J. at 206.

## IV.

We next consider what process is due under the circumstances.

## A.

The requirements of due process are "flexible" and are tailored to what the particular situation demands.  State in Interest of D.G.W., 70 N.J. 488, 502 (1976).  To determine the precise protections required in a given case, courts apply the balancing test set forth in Mathews v. Eldridge and consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the

31

> Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
>
> [424 U.S. 319, 335 (1976).]

Here, the inmates' generalized "liberty interest in being free from physical restraint," see Byrne, 93 N.J. at 210 (quoting Greenholtz, 442 U.S. at 23 (Marshall, J., dissenting in part)), is heightened by the widespread presence of COVID-19 in jail. That interest is weighty.

The current procedures also present a real risk that inmates might be deprived of that interest in error. The Review Committee and DOC have been tasked with reviewing thousands of individual cases on an expedited basis, with minimal input from the inmate. Even with the best of intentions, mistakes are inevitable. And no one can rule out entirely the possibility of arbitrary decisions. Yet no such shortcomings can be detected if the DOC does not tell inmates why they have been denied release. Right now, they are simply told that they "were considered" for home confinement and, "[a]fter thorough review, it has been determined that [they] will not be released."

Any remedy must also take into account the State's interest here. It is two-fold: to ensure that inmates fulfill the punitive aspect of their sentence, and to comply with the dictates of the Executive Order and process a large

number of cases expeditiously -- with the interests of the inmate, the public, and victims in mind. The burdens of any additional process must be considered in that context.

Under the circumstances, a full-blown set of procedural protections -- an adversarial hearing with counsel and a detailed statement of reasons -- is not required. Byrne offers a better approach: notice, an opportunity to be heard and respond, and a written statement of reasons. 93 N.J. at 211; see also S.C. v. Dep't of Children & Families, ___ N.J. ___, ___ (2020) (slip op. at 33, 43-44) (holding that the minimal requirements of due process -- "notice and opportunity to be heard" -- could be satisfied without an adversarial hearing in the context of an investigatory finding that an allegation of child abuse was "not established" but stressing that the notice given must set forth the basis of the finding, rather than rely on a conclusory statement, and that the opportunity to be heard must not be illusory). Balancing the relevant interests, we therefore find that the following protections are required to comport with due process.

First, inmates must be given an opportunity to present a written statement in support of their release. Inmates are now notified if they are eligible for emergency medical home confinement. As noted earlier, interested inmates fill out an application that asks for the following details: name; age;

the medications they are on; whether they have an underlying medical condition; the address and relevant phone numbers for the proposed home where they would be confined; their relationship to the site; whether the sponsor has agreed to allow them to reside at the site for the duration of the furlough; and whether the sponsor has agreed to provide transportation to and from jail. Aside from a single line to explain any medical condition, there is no place on the application form for inmates to express why they believe they should be considered for release. Nor is there another opportunity to do so during the furlough process.

In the same way that prosecutors and, through them, victims and next of kin have five days to submit their views in writing to the Parole Board and the Review Committee, inmates should be given that opportunity in the same time frame. They can proceed with or without counsel. Because the Public Defender has volunteered to assist inmates in the process, no right to counsel issues are implicated here. See Byrne, 93 N.J. at 211.

To enable the Public Defender's Office to help inmates, DOC shall provide the Public Defender with copies of all four eligibility lists generated under the Executive Order, as well as any supplemental ones. The lists shall be treated as though they are under seal, and the Public Defender may not

release them.  The Public Defender will need to follow up with inmates to seek a medical release authorizing access to their medical records.

That process will protect against any potential concerns under the Health Insurance Portability and Accountability Act of 1996 (HIPPA).  See 45 C.F.R. § 164.512(e)(1)(i) (allowing for the sharing of protected medical records in response to a court order under HIPPA).

Second, the Commissioner must provide an individualized statement of reasons that explains why the inmate was denied a medical furlough.  See Byrne, 93 N.J. at 211.  According to the Attorney General, the Parole Board has provided written statements for all cases in which it denied parole. Examples provided to the Court contain a list of mitigating factors and a list of reasons for denial.  In each sample in the record, the Parole Board panel checked some of the more than thirty pre-printed boxes for both lists and also provided handwritten, particularized explanations about the inmate in the spaces provided.

A lengthy narrative statement of reasons is not required so long as the Commissioner provides individualized reasons for each decision.  Such a statement will help guard against mistakes and arbitrary actions.  See ibid. Based on the Parole Board's experience in implementing the Executive Order, this additional requirement should not impose a substantial administrative

burden on the DOC. We note as well that requiring a statement of reasons is not inconsistent with the aims of the Executive Order.

Third, as in Byrne, inmates should have an opportunity to respond in writing to the statement of reasons. In that way, they may be able to cure a mistake or satisfy a concern of the Commissioner. For example, if the original sponsor is deemed unsatisfactory, the inmate can propose another; if the proposed housing is deemed unacceptable because of a factual mistake, the inmate can clarify the error. The Commissioner must consider the response before finalizing the agency's decision. Afterward, the inmate and counsel must receive prompt notice in writing.

Inmates can then seek to review the Commissioner's final decision in court. Final agency action is subject to appellate review, Acoli, 224 N.J. at 222-23; Silviera-Francisco v. Bd. of Educ. of Elizabeth, 224 N.J. 126, 140 (2016), and an inmate can pursue an appeal as of right before the Appellate Division, R. 2:2-3(a)(2).[4]

A deferential standard of review applies on appeal. A reviewing court will not overturn a final agency action unless it is arbitrary, capricious, or unreasonable. Yucht, 233 N.J. at 279. To apply that standard, courts consider

---

[4] Inmates denied parole can pursue administrative appeals, see Acoli, 224 N.J. at 223-24 (outlining administrative review process for parole decisions), and also have the right of appeal to the Appellate Division.

"whether the decision conforms with relevant law, whether there is substantial credible evidence in the record as a whole to support the agency's decision, and whether in applying the relevant law to the facts, the agency clearly erred in reaching its conclusion."  Id. at 280.

Wide discretion is afforded to administrative decisions because of an agency's specialized knowledge.  See Acoli, 224 N.J. at 222.  But "that discretion is not unbounded and must be exercised in a manner that will facilitate judicial review."  In re Vey, 124 N.J. 534, 543-44 (1991).

In the context of parole, which is comparable here again, the Board relies on its expertise to make "highly predictive and individualized discretionary appraisals" about whether an inmate will violate the conditions of parole.  Beckworth v. State Parole Bd., 62 N.J. 348, 359 (1973); see also N.J.S.A. 30:4-123.53(a).  Nonetheless, the "difficulty in gauging whether a parole determination constitutes an abuse of discretion" does not call for "a more exacting standard of judicial review than [what applies] to other administrative agency decisions."  Trantino v. State Parole Bd., 154 N.J. 19, 25 (1998); see also State Parole Bd. v. Cestari, 224 N.J. Super. 534, 548 n.6 (App. Div. 1988) ("We reject the contention that a more restrictive standard of judicial review should apply to parole [decisions] than to other administrative

37

agency decisions."). That applies as well to appellate review of the denial of an emergency medical furlough under the Order.

Once again, we rely on the Court's supervisory authority to require the Appellate Division to address any appeals in an expedited manner. See N.J. Const. art. VI, § 2, ¶ 3. Parties should be directed to submit briefs within three days of a notice of appeal, and the court should issue its decision within the next three days.

B.

We decline to compel the Commissioner or the Parole Board to act within a defined number of days. But we have done so for areas directly within the Judiciary's control because of the urgency of the situation.

The Public Defender and ACLU suggest the Court could have issued a writ of mandamus had this matter been filed as an action in lieu of prerogative writs. "A writ of mandamus is an order given by a court to a government official 'that commands the performance of a specific ministerial act or duty, or compels the exercise of a discretionary function, but does not seek to interfere with or control the mode and manner of its exercise or to influence or direct a particular result.'" In re Resolution of State Comm'n of Investigation, 108 N.J. 35, 45 n.7 (1987) (quoting Switz v. Township of Middletown, 23 N.J. 580, 587 (1957)). "[M]andamus is an appropriate remedy '(1) to compel

38

<u>specific</u> action when the duty is ministerial and wholly free from doubt, and (2) to compel the exercise of discretion, but <u>not</u> in a specific manner.'" <u>Vas v. Roberts</u>, 418 N.J. Super. 509, 522 (App. Div. 2011) (quoting <u>Loigman v. Twp. Comm. of Middletown</u>, 297 N.J. Super. 287, 299 (App. Div. 1997)).

The County Prosecutors Association, in turn, reminds us as a friend of the court that the "authority to compel agency action is exercised sparingly, [because] courts are ill-equipped to micromanage an agency's activities." <u>Caporusso v. Dep't of Health</u>, 434 N.J. Super. 88, 101 (App. Div. 2014). The Association also points to separation of powers concerns and notes that "control of policy-making [belongs] to the Governor and Legislature." <u>Ibid.</u> In that regard, Executive Order 124 does not prescribe a time frame for the Commissioner but calls for expedited action. And the timeline for decisions by the Parole Board is fixed by statute. <u>See</u> N.J.S.A. 30:4-123.55; <u>see also</u> N.J.A.C. 10A:71-4.2.

"Where an agency violates the express policy of its enabling act by violating the clear deadline for agency action, the omission is arbitrary and capricious." <u>Caporusso</u>, 434 N.J. Super. at 108-09. We recognize as well that the remedy of mandamus is available when a state agency neglects to perform a duty imposed by an Executive Order. <u>See Ironbound Health Rights Advisory Comm'n v. Diamond Shamrock Chem. Co.</u>, 216 N.J. Super. 166, 176 (App.

39

Div. 1987); see also In re Resolution, 108 N.J. at 45 n.7 ("Mandamus is a well-established remedy for 'official inaction.'" (quoting Joseph v. Passaic Hosp. Ass'n, 26 N.J. 557, 571 (1958), and citing Marbury v. Madison, 5 U.S. (1 Cranch) 137, 169-71 (1803))).

The Public Defender and ACLU take issue with the pace at which inmates have been released under the Executive Order. When they filed their brief on May 14, 2020, they noted that only 99 inmates had been released. By May 26, 2020, the Attorney General reported that 337 had been released and 280 more had been approved for release. As of June 1, 2020, an additional 70 inmates had been released. In addition, the Parole Board has completed its review and denied parole or reconsideration of parole in at least 751 cases.

Although we agree that time is of the essence here, the record before us does not demonstrate that the agency has neglected to implement the Executive Order. Because of the critical nature of the situation, we urge both the DOC Commissioner and the Parole Board to act expeditiously -- when the Commissioner decides whether to furlough an inmate and when the Parole Board makes both its initial decision and a determination in an administrative appeal. See Acoli, 224 N.J. at 223-24.

## C.

Application of the above principles needs to take into account what has and has not taken place in the review process up until now.

The Executive Order directs the DOC to generate four lists for each of the categories described above. They have already been prepared, and a large number of applications have been processed. In addition, the Executive Order requires that supplemental lists be prepared on a weekly basis that include additional inmates who "face a heightened risk of death or serious injury from COVID-19 based on their age and/or underlying medical conditions."

For inmates identified on the supplemental lists and others whose applications are still pending, the due process protections outlined above will apply to their cases in real time.

Inmates who have already been notified that the DOC did not approve them for a medical furlough present a different situation. Rather than start the process anew for them, and delay their review, the Commissioner should expeditiously prepare a statement of reasons that explains the decision, consistent with the above guidance. The statements should be served on the inmate and the Public Defender. Inmates will then be in a position to respond to concerns in a more focused way and can include more general advocacy in

41

their written response.  Afterward, the Commissioner is to finalize his decision in writing.

As noted earlier, inmates who have been denied parole received a statement of reasons and have existing avenues to seek administrative and court review of the Parole Board's decision.  Acoli, 224 N.J. at 222-24; R. 2:2-3(a)(2).  We again urge the Parole Board to proceed promptly in that regard.

## D.

Finally, we strongly encourage the DOC and Parole Board to publish and regularly update data about the number of inmates considered for release, the number approved for release, and the number actually released under the Executive Order.  Transparency is an asset to any public agency and enhances public confidence.  See Tarus v. Borough of Pine Hill, 189 N.J. 497, 507 (2007).

## V.

The Public Defender and the ACLU also seek relief related to custodial terms imposed on juveniles who are under the custody of the Juvenile Justice Commission (youths or residents).  Specifically, they ask the Court to modify sentences for those individuals with a maximum release date within the next twelve months.  Rutgers Criminal and Youth Justice Clinic (Rutgers Clinic), appearing as a friend of the court, seeks additional relief.

42

Courts retain jurisdiction over the disposition of juvenile matters. N.J.S.A. 2A:4A-45(a). That jurisdiction continues "for the duration of [the] disposition of commitment or incarceration." Ibid. Throughout that time, a judge can "substitute any disposition otherwise available . . . under [N.J.S.A. 2A:4A-43]." Ibid. In short, the Family Division has continuing jurisdiction over delinquent juveniles and can "change or modify an order of disposition at any time." State in Interest of R.M., 141 N.J. 434, 453 (1995) (quoting R. 5:24-6).

To determine the appropriate disposition for a juvenile adjudicated delinquent, courts weigh multiple factors set forth at N.J.S.A. 2A:4A-43(a), including "the well-being and physical safety of the juvenile." Id. at (a)(4). Judges may then impose incarceration or any of twenty dispositions listed by statute. State in Interest of C.V., 201 N.J. 281, 295 (2010) (citing N.J.S.A. 2A:4A-43(b)). Although not included in the list, suspended sentences are permitted "as a necessary, viable disposition." Ibid.

The JJC population differs markedly from the state's prison population. On March 1, 2020, there were 303 residents in JJC custody. On April 21, there were approximately 275. At that time, JJC began to implement universal testing and, as of May 28, had tested 274 residents. Twenty-eight residents tested positive for COVID-19, and none have died from it. By May 19, 257

43

individuals remained in JJC custody. Thirty-six staff members informed the JJC that they tested positive.

The Acting Executive Director of the JJC has certified to a number of safety measure at its facilities: daily temperature screening and masks for all residents; temperature checks and face masks for anyone entering a facility; enhanced cleaning and sanitizing protocols; reduced person-to-person contact; and quarantining of residents who test positive, among other steps.

As noted, youths in JJC custody can apply to the court and ask for their disposition to be modified. When such a motion is filed, judges are to evaluate the circumstances of each case. They may consider all relevant factors raised by the parties, including those set forth in N.J.S.A. 2A:4A-43(a) and the youth's conduct while in JJC custody. Judges must also consider health concerns brought on by COVID-19 and their impact on the particular resident's health condition.

We again invoke the Court's supervisory power over the administration of the court system to require an expedited briefing schedule for such motions, a return date within five days of filing, and a decision within the next three days. See N.J. Const. art. VI, § 2, ¶ 3. To the extent residents petition the Parole Board for review, we again urge the Board to proceed expeditiously.

The Rutgers Clinic also asks the Court to address "[a]ll custodial terms imposed on any juveniles who have been given verified release dates by the state parole board or whose terms of post-incarceration supervision were revoked for technical violations" and modify them to "time served." "[A]s a general rule, the Court 'does not consider arguments that have not been asserted by a party, and are raised for the first time by an amicus curiae.'" State in Interest of A.A., 240 N.J. 341, 359 n.1 (2020) (quoting State v. J.R., 237 N.J. 393, 421 (2017)); accord Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n, 91 N.J. 38, 48-49 (1982). We therefore do not address the request beyond the guidance for individual hearings outlined above.

VI.

For the reasons set forth in this opinion, we modify and supplement Executive Order 124 to comport with principles of due process. We have ordered certain steps to expedite any court proceedings that stem from this ruling. We urge the DOC and Parole Board to likewise expedite their ongoing responsibilities under the Order.

We have not granted the full relief the Public Defender and ACLU sought. The arguments raised do not provide a basis for that relief, and we recognize the role the other branches of government have. The Executive and

45

Legislative Branches retain the authority to enact policy changes in response to the spread of COVID-19 in state prisons and juvenile facilities.

The matter is remanded to the DOC for further proceedings consistent with this opinion.


JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in CHIEF JUSTICE RABNER's opinion.